# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
**No. 23-1780V**

| | |
|---|---|
| TONI OCHOA,<br><br>Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>Respondent. | Chief Special Master Corcoran<br><br>Filed: July 13, 2026 |

*John Robert Howie, Howie Law, PC, Dallas, TX, for Petitioner.*

*Ryan Nelson, U.S. Department of Justice, Washington, DC, for Respondent.*

## RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On October 11, 2023, Toni Ochoa filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act"), which she amended on November 13, 2023. Petitioner alleges that she suffered a shoulder injury related to vaccine administration ("SIRVA") as a result of an

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

influenza ("flu") vaccine received on October 29, 2020. Amended Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to settle the claim, and have now briefed entitlement and damages (ECF Nos. 30, 33, 34). For the reasons set forth below, I find that Petitioner likely suffered the residual effects of her condition for more than six months; that the vaccine was likely administered in her right shoulder; that her shoulder pain likely began within 48 hours of vaccination, that no other condition would likely explain her post-vaccination symptoms; and that she is otherwise entitled to compensation. For damages, I award **$45,000.00** for actual pain and suffering, plus **$693.96** for past unreimbursable expenses.

## I. Factual Evidence

### A. Medical Records

On October 29, 2020, Petitioner received a flu vaccine. Ex. 2 at 4. She received it at a local fire department clinic, and the situs of vaccine administration was not recorded. *Id*. at 1. On the same day, she saw her urologist for an unrelated condition, without mentioning shoulder pain. Ex. 9 at 13-15. A week later (November 5, 2020), she returned to her urologist for a procedure. *Id*. at 16. On examination, she exhibited normal gait, and no musculoskeletal abnormalities were noted, although the record does not specify whether her shoulders were examined. *Id*. at 18. The record of that appointment is silent on shoulder pain.

On December 11, 2020 (about a month and a half after vaccination), Petitioner saw an orthopedist for right shoulder and arm pain that began "6 weeks ago following receiving a flu shot." Ex. 10 at 2. Her shoulder was achy and sore for about a week after vaccination, worsened over the next several weeks, and was now constantly painful. *Id*. Around the same time, her dog "which is fairly large and strong ended up jerking her arm several times" while on a walk. *Id*. She now had pain at night and when reaching behind or across her body. *Id*. Over-the-counter ibuprofen provided temporary relief. *Id*. She had tried doing therapy exercises, but they aggravated her symptoms. *Id*. She rated her pain five out of ten. *Id*. On examination, her right shoulder range of motion ("ROM") was 180 degrees in flexion and abduction, 60 degrees in external rotation, and internal rotation was "limited to her hip only." *Id*. at 4. Petitioner was diagnosed with right shoulder impingement and bursitis, given a steroid injection, and referred for physical therapy ("PT"). *Id*. at 6-7.

Petitioner underwent a PT evaluation on December 16, 2020. Ex. 11 at 3. The evaluation record notes an onset date of October 29, 2020, and states that Petitioner received a flu vaccine at the end of October, which was followed by soreness. *Id*. "About two weeks later while walking her dog the dog jerked hard on the leash and she noted

*increased* pain following that." *Id*. (emphasis added). She was feeling "significantly better" and "fine" following the steroid injection. *Id*. She now rated her pain zero out of ten, ranging from zero at best to eight at worst. *Id*. On examination, the therapist noted "good quality active range of motion," which the therapist documented as within normal limits in all planes. *Id*. at 3-4. Petitioner's right shoulder exhibited positive results with slight pain when the therapist administered a supraspinatus test. *Id*. at 4. The therapist noted that Petitioner's steroid injection "seemed to resolve the patient's pain," although she exhibited reduced strength and limitations in functional and recreational activities. *Id*. Petitioner did not seek treatment for shoulder pain for nearly four months thereafter.

On April 13, 2021, Petitioner underwent a right shoulder MRI. Ex. 12 at 5. The MRI showed a thickened constricted capsule that was noted as possibly limiting ROM and "clinical adhesive capsulitis," as well as a concealed interstitial delamination tear of the supraspinatus and bursitis. *Id*. at 6.

Petitioner returned to her orthopedist for treatment of right shoulder pain on April 26, 2021. Ex. 10 at 11. She reported that a steroid injection she had received in December "completely resolved all of her symptoms and pain up until [M]arch." *Id*. However, in March she was "moving a washer when she had a return of her symptoms of pain" associated with a sensation of tightness in her shoulder and pain with reaching overhead. *Id*. She had started taking ibuprofen over the past week which had "nearly completely resolved her symptoms of pain." *Id*.

On examination, Petitioner's right shoulder exhibited full ROM and "[n]ormal appearance without tenderness." Ex. 10 at 13. Her orthopedist reviewed the MRI and found mild edema in the shoulder capsule "that would be consistent with a resolving adhesive capsulitis" as well as a very small partial tear. *Id*. Petitioner was diagnosed with bursitis, which was noted as an established problem that was improving, and adhesive capsulitis, which was recorded as a new problem that was self-limiting. *Id*. at 14. The orthopedist stated that he "suspect[ed] her current symptoms were more related to a flare-up of adhesive capsulitis which is already resolving." *Id*. at 15. He recommended that she continue ibuprofen for two weeks and resume PT exercises. *Id*.

Petitioner followed up with her orthopedist the following month, on May 27, 2021. Ex. 10 at 17. He noted a "history of having persistent shoulder pain following an injury when she was walking her dog and the dog pulled her arm." *Id*. After a steroid injection gave her "excellent pain relief," she was "trying to move her washer and dryer several months later which really aggravated her shoulder." *Id*. at 17-18. She had not seen any improvement since her last visit, and was experiencing persistent pain on the anterior aspect of her shoulder, which worsened with any reaching or lifting. *Id*. at 18. She rated her pain as moderate and intermittent, associated with certain movements and positions. *Id*. On examination, her right shoulder exhibited tenderness to palpation and ROM of 170 degrees in flexion and abduction, 60 degrees in external rotation, and "limited internal

rotation to her hip only." *Id*. She reported pain with impingement testing, and weakness with supraspinatus testing. *Id*. at 18-19. Petitioner was diagnosed with a right shoulder rotator cuff tear and adhesive capsulitis, which were noted as established problems that were worsening. *Id*. at 19. The orthopedist now "suspect[ed] that most of her symptoms [we]re more related to her rotator cuff." *Id*. Because she had tried anti-inflammatory medications, a steroid injection, and PT and continued to experience symptoms, Petitioner elected to undergo surgery. *Id*.

On July 12, 2021, Petitioner underwent right shoulder arthroscopy with rotator cuff repair, subacromial decompression, and debridement. Ex. 10 at 35.

Petitioner underwent a post-operative PT evaluation on August 2, 2021. Ex. 14 at 2. She rated her pain two out of ten, ranging from zero at best to five at worst. *Id*. right shoulder passive ROM was 100 degrees in flexion and 90 degrees in abduction. *Id*. at 3.

Petitioner continued PT until November 2021, attending 26 visits between August and November. Ex. 11 at 6-58. At her final session on November 15, 2021, she reported "very little right shoulder pain," though she continued to experience stiffness, especially with overhead activities. *Id*. at 56. Her right shoulder passive ROM had improved to 162 degrees in flexion and 110 degrees in abduction, though her weakness persisted. *Id*. at 57.

On the same day (November 15, 2021), Petitioner also saw her orthopedist. Ex. 10 at 59. She was feeling better, with some right shoulder achiness at night and pain at end of range motion. *Id*. at 60. She had experienced some post-operative adhesive capsulitis that was responding to PT. *Id*. Her ROM was not yet full, but continued to improve. *Id*. On examination, her right shoulder active ROM was 170 degrees in flexion and abduction. *Id*. The orthopedist noted that Petitioner was continuing to show improvement at every visit and was "getting close to her full range of motion." *Id*. at 61. He prescribed an anti-inflammatory medication to help with her residual limitations. *Id*.

### B. Testimonial Evidence

Petitioner has filed four declarations in support of her claim. Exs. 1, 16, 20, 23. She states that within "a couple of hours after" vaccination, she began to experience soreness in her right shoulder and upper arm. Ex. 1 at ¶ 4. She took over-the-counter medication, believing that her pain would resolve with time. *Id*. Instead, it worsened, leading her to consult an orthopedist. *Id*. She also told the physical therapist that her pain began on the date of vaccination. *Id*. at ¶ 6.

Petitioner describes her response to the December 2020 steroid injection as "outstanding," stating that it "resolved nearly all of my pain." Ex. 1 at ¶ 7. For this reason, she did not continue PT after her evaluation. *Id*. However, over the next couple of months, the effects of the steroid injection began to wane, and her symptoms worsened. *Id*. In

March 2021, while doing housework, her right shoulder pain became "increasingly noticeable," prompting her to request an MRI. *Id*.

Petitioner states that prior to vaccination, she regularly walked her dog on a leash without difficulty. Ex. 23 at ¶ 3. After vaccination, when her dog pulled on the leash it exacerbated the pain she was already experiencing. *Id*. She asserts that her dog pulling on the leash "did not cause any sort of new injury; rather, I experienced a worsening of the pain that I had been experiencing ever since my influenza vaccination." *Id*.

Concerning the return of her symptoms in the spring of 2021, Petitioner states that she "did not suffer a new injury" to her shoulder at that time while doing heavy cleaning. Ex. 23 at ¶ 4. Petitioner explains that while the December 2020 steroid injection provided almost-complete pain relief, her pain returned over the following months. *Id*. As the effects of the steroid waned, her pain grew "increasingly worse until it began to substantially interfere with my ability to perform my necessary activities including heavy cleaning." *Id*. She realized that she could not tolerate her pain and activity restrictions when performing heavy cleaning in March 2021, which prompted her to contact her orthopedist for an MRI. *Id*. If she had thought it was a new injury, she states that she would have sought a new orthopedic evaluation first rather than an MRI. *Id*. She adds that at no point during the time from vaccination to surgery did she ever suffer anything that she thought was a new injury separate and apart from her vaccine-related injury. *Id*. At all times, her right shoulder pain was the same, just varying in degree. *Id*.

Petitioner states that at the time of her vaccine-related injury, she worked as a health assistant in the nurse's office of an elementary school, which required her to remain certified in CPR and be capable of performing CPR and the Heimlich maneuver, both of which place "considerable force" on shoulders. Ex. 20 at ¶ 2. Her shoulder injury (to her right, dominant arm) rendered her unable to perform these maneuvers; as a result, she had to leave her former position and take a different job that she does not enjoy. *Id*. She states that she "truly enjoyed working with the children who were sick or injured in my position as a school nurse." *Id*.

Petitioner states that her injury has impaired her ability to engage in recreational activities such as pickleball and yoga. Ex. 20 at ¶¶ 4, 5. She remains unable to lift heavy items as she could prior to her injury, and cannot remove small kitchen appliances from overhead shelves. *Id*. at ¶ 6.

Petitioner's husband, Steve Ochoa, filed a declaration in support of her claim. Ex. 19. He states that she called him on the day she received the vaccine, stating that her arm was "unusually sore." *Id*. at ¶ 2. As time passed and the pain remained, he recommended that she see a doctor. *Id*. at ¶ 4. He reports that Petitioner used her medical knowledge to self-treat, doing PT exercises she found online and taking anti-inflammatory medication. *Id*.

Petitioner's husband states that the steroid injection she received "provided her with only short-term relief," and after "several weeks" her symptoms again worsened. Ex. 19 at ¶ 4. He states that she delayed returning to the orthopedist because she expected him to recommend surgery, and she had no desire to undergo surgery, preferring to exhaust all other options before considering it. *Id*.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs*., 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[3] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury, or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs*., No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen-month gap); *Silvestri v. Sec'y of Health & Human Servs*., No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five-month mark).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying "Qualifications and Aids to Interpretation" ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the

[3] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

(i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time-frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

**B. Parties' Arguments on Entitlement**

Respondent argues that Petitioner's shoulder condition had fully resolved as of December 16, 2020 - more than *four months* short of the six-month requirement. Response, filed May 30, 2025, at *8 (ECF No. 33) ("Resp."). At that time, she voluntarily discontinued PT, and did not seek further treatment until an intervening event – moving household appliances – caused a new injury. Resp. at *9. Thus, Respondent asserts that Petitioner "had a full resolution of right shoulder pain and ROM until she attempted to move a washing machine in March 2021." *Id*. at *11.

Respondent further asserts that Petitioner has not established that the onset of her shoulder pain occurred within 48 hours of vaccination. Resp. at *12-13. He emphasizes that she saw her urologist twice, on the day of vaccination and a week later, without mentioning shoulder pain. *Id*. at *12. And when she saw an orthopedist, she did not state that her pain began within two days of vaccination, and partially attributed her pain to her dog pulling her. *Id*. Finally, Respondent asserts that Petitioner cannot meet the fourth QAI because her "right shoulder and arm pain can be explained by the trauma to her shoulder resulting from her attempt to move a clothes washer." *Id*. at *13.

Petitioner argues in reply that it "cannot be expected that a petitioner would discuss the onset of shoulder pain with a urologist." Reply, filed June 12, 2025, at *3 (ECF No. 34) ("Reply"). Additionally, the record does not clarify whether Petitioner's urology appointment on the date of vaccination occurred before or after vaccination, and the visit a week later was for a procedure. *Id*.

Concerning the severity requirement, Petitioner asserts that resolution of her symptoms following a steroid injection does not break the causal connection between vaccination and later symptoms. Reply at *6. In support, Petitioner cites *Cross v. Sec'y of Health & Human Servs.*, No. 19-1958V, 2023 WL 120783 (Fed. Cl. Spec. Mstr. Dec. 2, 2022) and *Sawyer v. Sec'y of Health & Human Servs*., NO. 19-1473V, 2023 WL 4505208 (Fed. Cl. Spec. Mstr. June 12, 2023). Id. at *7. The petitioners in *Cross* and *Sawyer* both experienced significant relief from a steroid injection, followed by a gap in treatment and return to care. *Id*. And both petitioners were found to have satisfied the statutory severity requirement.

### C. Factual Findings on Severity

The record supports a finding that Petitioner likely experienced the residual effects of her condition for more than six months. Petitioner received a steroid injection about six weeks after the onset of her symptoms, and this treatment provided significant relief, resulting in her describing her condition as "fine" five days later, and not again seeking treatment for nearly four months.

By April 2021 - now four months without treatment - Petitioner underwent a shoulder MRI. There does not appear to be any office visit associated with the scan. She then saw her orthopedist on April 26, 2021 – almost exactly six months after the onset of her shoulder pain. At that time, she reported that the December steroid injection had relieved her pain, but she was now experiencing "a return of her symptoms." Ex. 10 at 11. Her orthopedist diagnosed her with bursitis, as in December, and noted it as an "established problem" – suggesting that he viewed an aspect of her symptoms as a continuation of her vaccine-related injury.

Of course, when Petitioner returned for treatment at this time, she did not directly relate the symptoms she was seeking to have evaluated to the late-October 2020

vaccination. And she implied her injury had largely abated, with recurrence more likely due to shoulder strain caused by moving an appliance. She also suggested that the December 2020 steroid injection had relieved her prior symptoms to a significant degree. Ex. 10 at 11. Her reference to her prior treatment and a "return" of her symptoms implicitly establishes some small recurrence of her vaccine-related symptoms, which might otherwise have abated completely by this time but for the intervening event.

All of the above supports the finding that Petitioner has *barely* met the severity requirement (although in this case the requirement's satisfaction is a function of how preponderance works in close cases). *K.A. v. Sec'y of Health & Human Servs*., 164 Fed. Cl. 98, 127 (2022) ("[t]he preponderance of evidence standard is often described as 50 percent plus a feather") (*citing Torday v. Sec'y of Health & Human Servs*., No. 07-372V, 2009 WL 5196163 (Fed. Cl. Spec. Mstr. Dec. 10, 2009)). I conclude from the record that Petitioner's shoulder had by April 2021 *almost* fully recovered, but was then exacerbated by a new, unrelated injury. Whatever was left of the SIRVA by this point was minimal, but sufficiently in existence to be capable of worsening by an intervening stimulus.

At the same time, however, it is preponderantly clear that the strain-associated incident Petitioner experienced in March 2021 explains what followed (along with degenerative and comorbid shoulder issues) - *not* the SIRVA. *See,* e.g., Ex. 10 at 19 (May 2021 orthopedic visit attributing Petitioner's ongoing issues to rotator cuff tear).[4] This weakness in the evidence does not prevent an entitlement determination, but it greatly limits the damages to be awarded.

### D. Factual Findings Concerning Situs

The record supports a finding that Petitioner received the flu vaccine in her right shoulder. Although the vaccination record is silent on the situs of administration, Petitioner sought care a month and a half after vaccination, stating that her right shoulder began hurting after receiving a flu vaccine. Ex. 10 at 2. She also related her right shoulder pain to vaccination at her PT evaluation. Ex. 11 at 3. And no records suggest another situs.

### E. Factual Findings Concerning Onset

The record supports a finding that Petitioner's shoulder pain likely began within 48 hours of vaccination. Petitioner sought care within six weeks of vaccination, relating her pain to vaccination. Ex. 10 at 2. Her December 2020 PT evaluation lists an onset date of

---

[4] *See, e.g.*, *Williams v. Sec'y of Health & Human Servs.*, No. 19-1420V, 2024 WL 914908, at *9 (Fed. Cl. Spec. Mstr. Jan. 30, 2024) (quoting as persuasive an expert report opining that it would be "incredibly difficult, if not impossible" for a flu shot to cause a rotator cuff tear, and considering it more likely that the claimant had a pre-existing tear); *Quantie v. Sec'y of Health & Human Servs.*, No. 18-610V, 2023 WL 2234271, at *9 (quoting claimant's expert as explaining that a SIRVA is not a mechanical injury; "it's not the needle going into the cuff that injures it." Rather, if a vaccine is administered too high on the shoulder, it can over penetrate the deltoid muscle into the bursa or capsule, underneath the rotator cuff, and the vaccine itself can cause pain via two different mechanisms).

October 29, 2020 – the date of vaccination. Ex. 11 at 3. And Petitioner has provided testimonial evidence that her shoulder pain began on the date of vaccination. Ex. 1 at ¶ 4.

Although Petitioner delayed seeking medical treatment, this is not uncommon in SIRVA cases. *Tully v. Sec'y of Health & Human Servs*., No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs*., No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

### F. Petitioner has Established that No Other Condition Explains his Post-Vaccination Symptoms

Respondent suggests that Petitioner cannot satisfy the fourth QAI because her "right shoulder and arm pain can be explained by the trauma to her shoulder resulting from her attempt to move a clothes washer" in March 2021. Resp. at *13. But Petitioner's injury from the vaccine administration had occurred *prior* to this point – and I have found that her injury also likely existed for six months, and that the appliance movement-related issue exacerbated what was left of the injury at that point. Thus, this is not a case where an external factor better explains the SIRVA.

### G. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not disputed, and I find that they are satisfied. The record does not contain preponderant evidence that Petitioner had a history of right shoulder pain that would explain her post-vaccination symptoms. Ex. 1. She exhibited reduced ROM, and her symptoms were limited to the shoulder in which the vaccine was administered. Ex. 10 at 2; Ex. 11 at 3. She received a covered vaccine in the United States. Ex. 2 at 4 And she states that she has never received compensation in the form of an award or settlement for her vaccine injuries, nor has she filed a civil action. Ex. 1 at ¶ 27.

Petitioner has established by preponderant evidence that all Table SIRVA and QAI requirements are established. Further, she has established all statutory requirements for entitlement. Thus, Petitioner is entitled to compensation.

## III. Damages

### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section II of *Matthews v. Sec'y of Health & Human Servs*., No. 22-1396V, 2025 WL 2606607 (Fed. Cl. Spec. Mstr. Aug. 13, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

### B. Parties' Damages Arguments

Petitioner seeks a pain and suffering award of $110,000.00, citing decisions in *Bidlack*, *Selling*, *Cates*, *Vaccaro*, *Knudson*, and *Guymon*, in which the petitioners were awarded between $100,000.00 and $110,000.00 in pain and suffering.[6] Petitioner's Motion, filed March 26, 2025, at 34-51 (ECF No. 30) ("Mot."). Petitioner emphasizes that she sought care 43 days after vaccination, and treated her injury until 13 months after onset. Mot. at *35. She underwent surgery, one steroid injection, and two rounds of PT totaling nearly 30 sessions. *Id*. Her treatment course included a four-month treatment gap after obtaining relief from a steroid injection. *Id*. Petitioner adds that having to transfer from working as a school nurse to a desk job has caused her "a significant amount of anguish" because she enjoyed working with children, and did not enjoy her new position. *Id*. at *36.

---

[5] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[6] *Bidlack v. Sec'y of Health & Human Servs.*, No. 20-0093V, 2023 WL 2885332 (Fed. Cl. Spec. Mstr. April 11, 2023); *Selling v. Sec'y of Health & Human Servs.*, No. 16-0588V, 2019 WL 3425224 (Fed. Cl. Sped. Mstr. May 2, 2019); *Cates v. Sec'y of Health & Human Servs.*, No. 18-0277V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020); *Vaccaro v. Sec'y of Health & Human Servs.*, No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022); *Knudson v. Sec'y of Health & Human Servs.*, No. 17-1004V, 2018 LW 6293381 (Fed. Cl. Spec. Mstr. Nov. 7, 2018); and *Guymon v. Sec'y of Health & Human Servs.*, No. 19-1422V, 2022 WL 1447006 (Fed. Cl. Spec. Mstr. March 25, 2022).

Respondent proposes an award of not more than $41,500.00, citing decisions in *Norton*, *Rayborn*, and *Ramos*, in which the petitioners were awarded between $40,000.00 and $55,000.00.[7] Resp. at *20-22. Respondent asserts that Petitioner suffered a mild injury, with limited treatment, and argues that treatment Petitioner received after March 2021 is not vaccine-related. *Id*. at *16-17. He emphasizes that prior to the "washing machine incident in March 2021," Petitioner was pain-free, with full ROM, without need for medication. *Id*. at *17. He adds that Petitioner's orthopedist "explicitly stated the surgery was due to the intervening shoulder injuries," citing a May 2021 orthopedist record attributing Petitioner's pain to her rotator cuff tear – but ignoring that a month earlier, the same orthopedist attributed Petitioner's symptoms to bursitis and adhesive capsulitis. *Id*. (citing Ex. 10 at 17-19).

Petitioner replies that the cases Respondent cites are not comparable, noting that none involve petitioners who underwent surgery. Reply at *12. Petitioner asserts that Respondent has not cited any surgical SIRVA cases that would support his proposed award. *Id*.

### C. Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

As stated above, the evidence preponderantly supports a finding that Petitioner's injury persisted until the six-month mark, but not beyond. While she did continue to obtain treatment after April 2021, it is exceedingly difficult on this record – where the claimant mostly reported complete recovery before six months, where she only had two initial months of active treatment, *and* where subsequent records better support the conclusion that that degenerative/comorbid shoulder issues explained her problems – to find that her later treatment involved the SIRVA. Because her sequelae thereafter are likely related to her unrelated injury sustained while moving an appliance, I find that her surgery and post-operative care are not attributable to her SIRVA (which likely resolved not long after the six-months cutoff). *See Williams v. Sec'y of Health & Human Servs*., No. 19-1420V, 2024 WL 914908, at *8-9(Fed. Cl. Spec. Mstr. Jan. 30, 2024) (finding that after a claimant's SIRVA stabilized, a separate incident much later that resulted in additional shoulder treatment was not associated with her SIRVA).

---

[7] *Norton v. Sec'y of Health & Human Servs*., No. 19-1432V, 2021 WL 4805231 (Fed. Cl. Spec. Mstr. Sept. 14, 2021); *Rayborn v. Sec'y of Health & Human Servs*., No. 18-0226V, 2020 WL 5522948 (Fed. C. Spec. Mstr. Aug. 14, 2020); and *Ramos v. Sec'y of Health & Human Servs*., No. 18-1005V, 2021 WL 688576 (Fed. Cl. Spec. Mstr. Jan. 4, 2021).

Petitioner suffered a relatively mild SIRVA that persisted *just* until the six-month deadline. She treated her condition with a steroid injection and a PT evaluation. A steroid injection provided near-total pain relief for several months, resulting in a four-month treatment gap. That injury and treatment course bears many similarities to that of the petitioner in *Norton v. Sec'y of Health & Human Servs*., No. 19-1432V, 2021 WL 4805231, at *5-6 (Fed. Cl. Spec. Mstr. Sept. 14, 2021). In that case, the claimant received a steroid injection two and a half months after vaccination that provided "significant relief." *Id*. However, unlike Ms. Ochoa, the *Norton* claimant continued treatment for several months thereafter, suggesting that her symptoms persisted to a greater degree. Furthermore, the *Norton* petitioner sought care much sooner than Ms. Ochoa, just 17 days after vaccination, and attended several months of PT, with no treatment gaps. Taking these factors into account, I find that $45,000.00 is an appropriate pain and suffering award in this case.

### D. Appropriate Compensation for Unreimbursed Expenses

Petitioner seeks $4,038.33 in out-of-pocket unreimbursed expenses, comprised of expenses for her orthopedist, surgery, and PT. Mot. at *52; Exs. 21, 22. Respondent agrees to reimbursement of $693.96 based on his position that Petitioner's rotator cuff injury and surgery were not related to her SIRVA, but to unrelated incidents, and thus expenses beyond May 2021 are not compensable. Respondent's Status Report, filed May 19, 2026 (ECF No. 35). Respondent does not object to Petitioner's claimed expenses on any other basis, however.

In light of my ruling that Petitioner's treatment following her appliance-moving injury is not attributable to her SIRVA, I determine that Respondent's calculation is better supported.

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $45,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering**.[8] Additionally, I find that Petitioner is entitled to **$693.96 in unreimbursable expenses**.[9]

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] The parties agree that this sum is reimbursable. Mot. at *14; Resp. at *13-14.

Based on consideration of the record as a whole and arguments of the parties, **I award Petitioner a lump sum of $45,693.96, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of Court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.